IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


KENNETH L. SHIELDS,                          08-CV-925-BR

          Plaintiff,

                                             OPINION AND ORDER
v.

MULTNOMAH COUNTY SHERIFF
SKIPPER, FACILITY COMMANDER
ADGERS, CHAPLAIN LEWIS KYLE,

          Defendants.


KENNETH L. SHIELDS
3876 NE Glisan
Portland, OR 97232
(503) 740-2026

          Plaintiff, *Pro Se*


1 - OPINION AND ORDER

**AGNES SOWLE**
Multnomah County Attorney
**STEPHEN LEWIS MADKOUR**
Assistant Multnomah County Attorney
501 SE Hawthorne, Suite 500
Portland, OR 97214
(503) 988-3138

      Attorneys for Defendants

**BROWN, Judge.**

    This matter comes before the Court on Defendants' Motion (#17) for Summary Judgment.  For the reasons that follow, the Court **GRANTS** Defendants' Motion.

<u>BACKGROUND</u>

    Plaintiff, a former inmate at the Multnomah County Detention Center (MCDC), brought this action *pro se* against Defendants alleging that they interfered with the practice of his Native American religion by denying him access to a "Native American religious clergyman" and by "requesting personal information" about his race, nationality, ethnicity religion or cult[u]ral beliefs."  Although it is unclear from Plaintiff's Complaint, it appears Plaintiff's claims arise under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C § 2000cc-1(a), and the First and Fourteenth Amendments to the United States Constitution.

    Defendant Skipper is the Multnomah County Sheriff, Defendant

2 - OPINION AND ORDER

Adgers is the Facility Commander at MCDC, and Defendant Kyle is a chaplain with the Multnomah County Sheriff's Office (MCSO).

On August 5, 2008, Plaintiff filed his Complaint in this Court. At that time, he was an inmate at MCDC. On August 14, 2008, Plaintiff was released from MCDC.

On October 14, 2008, Defendants filed their Answer and Affirmative Defenses. On April 9, 2009, Defendants filed a Motion for Summary Judgment as to all of Plaintiff's claims. Plaintiff did not respond to Defendants' Motion even though he was provided with sufficient notice[1] and opportunity to do so.

### STANDARDS

Federal Rule of Civil Procedure 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show the absence of a genuine issue of material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty*

---

[1] On October 10, 2008, the Court issued a Summary Judgment Advice Notice to Plaintiff advising him that if he did not submit evidence in opposition to any motion for summary judgment, summary judgment would be entered against him if it was appropriate.

3 - OPINION AND ORDER

*Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court must draw all reasonable inferences in favor of the nonmoving party.  *Id.* "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues."  *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citing *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Local Union No. 1936,* 680 F.2d 594, 598 (9th Cir. 1982)).

The substantive law governing a claim or a defense determines whether a fact is material.  *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  Thus, if the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment.  *Id.*

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants contend there is not a genuine issue of material fact as to Plaintiff's claims, and, therefore, Defendants are entitled to judgment as to all of Plaintiff's claims as a matter of law.

Although Plaintiff did not respond to Defendants' Motion, the burden remains on Defendants to establish that the material facts are undisputed as to those issues for which they seek summary judgment and that they are entitled to judgment as a matter of law.  *See Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993)(to grant summary judgment when nonmovant fails to

respond would constitute an abuse of discretion when movant's papers were insufficient to support summary judgment or on their face reflect a genuine issue of material fact exists).

Because Plaintiff did not respond to Defendants' Concise Statement of Facts, he is deemed to have admitted those facts pursuant to Local Rule 56.1(f) except when such an admission on the part of Plaintiff materially conflicts with a reasonable inference to be drawn in his favor. *See Villiarimo*, 281 F.3d at 1061 (all reasonable inferences must be drawn in favor of the nonmoving party).

## I.    Plaintiff's claims as analyzed under RLUIPA.

When construing a complaint, the court must consider the notice pleading standard provided under Federal Rule of Civil Procedure 8 in accordance with the less stringent standard applicable to the pleadings of *pro se* inmate litigants to determine whether the defendants have been sufficiently placed on notice of the nature of the inmate's claims. *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008).  When the inmate's complaint "contains factual allegations establishing a plausible entitle-ment to relief under RLUIPA," that is sufficient to put a defendant on notice of the plaintiff's claim.  *Id.* (internal quotation marks and citations omitted).  Here Plaintiff states a claim under RLUIPA by alleging Defendants violated his right to practice his religion because he did not have access to see a

Native American clergyman[2] while he was incarcerated at MCDC.
Those allegations sufficiently placed Defendants on notice of
Plaintiff's RLUIPA claim, which Defendants acknowledge in that
their Motion is directed against such a claim by Plaintiff.

RLUIPA provides in pertinent part:  "No government shall
impose a substantial burden on the religious exercise of a person
residing in or confined to an institution . . . even
if the burden results from a rule of general applicability"
unless the government establishes the burden (1) is "in
furtherance of a compelling government interest" and (2) is "the
least restrictive means of furthering that . . . interest."  42
U.S.C. § 2000cc-1(a).

The Supreme Court has noted "RLUIPA . . . protects
institutionalized persons who are unable freely to attend to
their religious needs and are therefore dependent on the
government's permission and accommodation for exercise of their
religion."  *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005).
RLUIPA defines "religious exercise" as "any exercise of religion,
whether or not compelled by, or central to, a system of religious
belief."  42 U.S.C. § 2000cc-5(7)(A).  "This definition reveals

---

[2] Consistent with the parties' lexicon, the Court will use
"chaplain" to refer to a staff member or certified volunteer of
MCSO and "clergyman," "religious clergyman," or "personal
clergyman" to refer to an individual who is not a staff member or
certified volunteer of MCSO from whom an inmate seeks religious
guidance.  When the distinction between a staff and volunteer
chaplain is irrelevant, the Court will use "MCSO chaplain."

Congress' intent to expand the concept of religious exercise
contemplated in traditional First Amendment jurisprudence."
*Lewis v. Ryan*, No. 04cv2468 JLS(NLS), 2008 WL 1944112, at *28
(S.D. Cal. May 1, 2008)(citing *Civil Liberties for Urban
Believers v. City of Chicago*, 342 F.3d 752, 760 (9th Cir. 2003)).

Under RLUIPA, the plaintiff "'bears the initial burden of
going forward with evidence to demonstrate a *prima facie* claim'
that the challenged state action constitutes 'a substantial
burden'" on the plaintiff's exercise of religion.  *Lewis*, 2008 WL
1944112, at *28 (quoting *Warsoldier v. Woodford*, 418 F.3d 989,
994 (9th Cir. 2005)).  As noted, the defendant may overcome the
plaintiff's *prima facie* claim by providing sufficient evidence to
establish "the regulation serves a compelling government interest
and is the least restrictive means of achieving that interest."
*Shakur v. Schriro*, 514 F.3d 878, 889 (9th Cir. 2008).  *See also* 42
U.S.C. § 2000cc-1(a).

   **A.   *Prima facie* claim**.

As noted, Plaintiff has the burden "'to demonstrate a
*prima facie* claim that the challenged state action constitutes a
substantial burden'" on Plaintiff's exercise of religion.
Although RLUIPA does not define what constitutes a "substantial
burden" on religious exercise, the Ninth Circuit has noted the
burden is substantial under RLUIPA when a defendant "'denies [an
important benefit] because of conduct mandated by religious

belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Warsoldier*, 418 F.3d at 995 (quoting *Thomas v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 717-18 (1981)).  *See also Shakur*, 514 F.3d at 888 (quoting same from *Warsoldier* as applicable standard).

As to whether there is any triable issue of fact concerning the claim that Defendants violated Plaintiff's right to exercise his religion because he did not have access to a Native American religious clergyman at MCDC, the following facts are not disputed.

Plaintiff is a Native American and identifies himself as a member of the Sisseton-Wahpeton Dakota Nation Sioux and Turtle Mountain Band of Chippewa.  Plaintiff's religion comprises Native American cultural practices, including drum ceremonies, sweat lodges, prayers, meditation, and social gatherings such as powwows.  Decl. of Steven Madkhour at ¶ 2, Pl.'s Dep. at 9:3-4, 10:9-10, 12:16-25.[3]

Plaintiff aspires to be "a holy man for the Native American people."  *Id*. at 9:17-18.  In pursuit of this goal, Plaintiff studies and engages in the practices of other religions, including Islam and various denominations of

---

[3]  Citations to Plaintiff's deposition reference page numbers from the original transcript.

8 - OPINION AND ORDER

Christianity. *Id*. at 9:6-18.  Plaintiff studies and intermittently practices other religions to acquire a broader religious perspective in his quest to become a Native American holy man.  Pl.'s Dep. at 9:9-18.  For example, Plaintiff studied Islam at MCDC, which included his participation in groups led in Islamic prayer by MCSO volunteer chaplain Rasheed as well as groups of inmates gathering for solitary Islamic prayer.  In addition, Plaintiff requested and received a Halal diet.

Although Plaintiff was able to pursue his study of Islam at MCDC without limitation or burden, Plaintiff asserts Defendants impermissibly burdened the exercise of his Native American culture and religion by failing to provide him with access to a Native American religious clergyman under the conditions of his request, which are discussed below.  Plaintiff had access to MCSO staff and volunteer chaplains, but he maintains none had sufficient knowledge of Native American culture to meet his needs in the exercise of his religion. Plaintiff submitted two grievances in this regard and filed his Complaint in this Court before his release from MCDC.

On June 20, 2008, Plaintiff submitted the first of two Inmate Grievance Forms in which he stated:  "I feel that you are in violation of my [rights under the] 1st and 14th Amendment[s]. I would like to speak to a religious clergyman of the Native American Cult[ure]. . . .  I spoke to a Chaplain and he told me

9 - OPINION AND ORDER

that you don't have a Native American Clergyman."

On June 22, 2008, MCSO responded:  "[G]ive us a name and number of any native American Cult[ure] that you serve under and once we verify his official position we will be happy to have him or her here [to] help you out.  Provide us the info on your personal clergyman please."

On June 24, 2008, Plaintiff filed another grievance in which he asserted:  "Another (2) days have [gone] by and you still haven't allowed me to practice my religious beliefs or my rituals and teachings. . . .  This violates my [rights to] due process and [under the] equal protection clause."

Captain Linda Yankee responded:  "The Chaplain spoke with you on 6/24 & 6/25 about your religious requests[.  Y]ou told the Chaplain that you just got out of NARA[4] & people would come see you but you need to provide us names.  I would be more than happy to contact anyone from the Native American community to come see you, on your behalf."

> Plaintiff testified:
>
> Q:    And the cultural practice that you
>       wanted to do was what, specifically?
>
> A:    I just wanted to talk to somebody so I
>       could create a resource and ask for a
>       Native American prayer.

Pl.'s Dep. at 33:18-22.

---

⁴  "NARA" is an acronym for the Native American Rehabilitation Association.

10 - OPINION AND ORDER

Plaintiff also testified his religious practice includes Native American prayer in circumstances that do not require the presence of a Native American clergyman:

Q:    "Can anyone run the prayer or meditation
      aspect of running your culture.

A:    Yes.

Q:    Could I?

A:    If you were to be asked, yes."

Pl.'s Dep at 16:2-6.

Q:    Is the prayer done in group or solo?

A:    In any way[,] shape, or form, just like
      Christianity, Buddhism, [and other
      religions].

Pl.'s Dep at 33:23-25.

It is undisputed that none of the MCSO chaplains was qualified to satisfy Plaintiff's request for a Native American religious clergyman; *i.e.*, a religious clergyman who Plaintiff would have considered sufficiently knowledgeable of Native American culture.

Plaintiff did not state in any of his grievances that Defendants failed to provide him with access to a specific Native American religious clergyman and, in fact, complained more generally about Defendants' failure to provide him with access to a clergyman possessing certain qualifications. Nevertheless, Defendants responded to Plaintiff's grievances by asking him to provide the name and contact information of his personal

11 - OPINION AND ORDER

clergyman.  Defendants' response conformed with MCSO policy
applicable when an inmate asks to see his personal clergyman;
*i.e.*, someone other than a chaplain on MCSO's staff or on MCSO's
list of certified volunteers.  Plaintiff, however, had not
been in contact with his personal clergyman for ten years.
Plaintiff's contact information, therefore, had not been updated
during those intervening years, and Plaintiff no longer knew his
clergyman's address.  The best information Plaintiff could
provide was the name of the clergyman and the number of a Post
Office Box associated with St. Anne's Catholic Church in
Belcourt, North Dakota.

        To the extent Plaintiff asserts it was impermissible
for Defendants to request contact information as to his personal
clergyman, Plaintiff did not have a reasonable expectation of
privacy after he submitted his grievances.  In any event,
Plaintiff waived any privacy interest in that information when he
gave it to MCDC without being compelled to answer the question
and in light of the fact that he could have replied he did not
have a personal clergyman or he could have requested Defendants
to use their own resources to find a Native American clergyman
for him.

        Although Plaintiff could not name a clergyman locally,
he suggested Defendants contact Portland Community College (PCC)
or NARA, which operated a facility where Plaintiff had previously

received residential treatment.  Although Plaintiff could not identify any specific person for Defendants to contact at these organizations, he asserts he could have found an appropriate contact within approximately six hours if he had not been an inmate at MCDC.

In any event, Plaintiff alleges he "gave MCDC 40 days as of 6/22/08 to bring" his personal clergyman or to bring another Native American clergyman to see him at MCDC.  On August 14, 2008, thirteen days after the expiration of that forty-day period, Plaintiff was released.  After his release, Plaintiff attempted to recruit a volunteer from the Native American community to serve the religious needs of inmates at MCDC, but as of his deposition on March 4, 2009, he had not been successful.

After substantial effort over a period of more than three months, MCSO recruited a potential volunteer chaplain from the Native American community who was approved by MCSO to pursue certification on April 1, 2009, and who was in the process of becoming certified at the time Defendants filed their Motion for Summary Judgment.

As noted, to establish a *prima facie* claim, there must be evidence Defendants placed a substantial burden on Plaintiff's exercise of his religion.  *See Lewis*, 2008 WL 1944112, at *28 (quoting *Warsoldier*, 418 F.3d at 994).  A burden is substantial if there is evidence that Defendants pressured Plaintiff "to

modify his behavior and violate his beliefs." *See Warsoldier*,
418 F.3d at 995.  On this record, however, the Court concludes
there is insufficient evidence to establish that Defendants
substantially burdened Plaintiff's exercise of his religion.

Although there is evidence that Plaintiff's access to a
Native American clergyman was limited in general, there is
insufficient evidence that Defendant's practices or policies
resulted in a substantial burden on Plaintiff's religious
exercise.  To the extent MCDC's certification policy for
volunteer clergy may have placed a burden on Plaintiff's access
to a Native American clergyman, the Court notes the certification
requirement applies to the approximately 85 people who are
regularly at MCSO facilities to minister to the inmates'
spiritual needs (such as Chaplain Rasheed, with whom Plaintiff
studied and practiced Islam at MCDC) rather than a member of the
clergy who wants to visit a particular inmate.  In addition,
Defendants are somewhat limited in their capacity to provide
nonstaff chaplains because they are volunteers.  *See, e.g.,*
*Odneal v. Pierce*, No. 06-41165, 2009 WL 901511 *4 (5th Cir.
2009)(affirming District Court's dismissal of RLUIPA claim when
the infrequency of requested ceremony was due to dearth of
outside volunteers rather than a regulatory prohibition).

Moreover, there were ways for Plaintiff to practice his
religion at MCDC other than in the presence of a Native American

14 - OPINION AND ORDER

clergyman.  Plaintiff's religious exercise included practices such as Native American prayer and meditation in solitude or with a group, which do not require the presence of a Native American clergyman.  In fact, Plaintiff testified anyone could lead Native American group prayer and it could take any form, including individual prayer in the context of a group setting.

In addition, Plaintiff alleged he asked to be provided with access to a Native American clergyman no later than forty days after June 22, 2008.  Even if Defendant were deemed to have burdened Plaintiff's religious exercise, it could only be for the brief period he was at MCDC after these forty days (*i.e.*, the thirteen days preceding his release).

For these reasons, the Court finds the evidence is insufficient to establish that Defendants substantially burdened Plaintiff's exercise of his religion by failing to provide him with access to a Native American clergyman at MCDC.  Accordingly, the Court dismisses Plaintiff's RLUIPA claim.

**B.    Least restrictive means to achieve a compelling government interest.**

Even if Plaintiff could establish a *prima facie* claim under RLUIPA, Defendants have presented sufficient evidence to overcome that claim by showing that their response to Plaintiff's request to see a Native American clergyman served a compelling government interest of "maintaining good order . . . consistent with considerations of costs and limited resources" and was the

15 – OPINION AND ORDER

least restrictive means of achieving that interest.  *See* 42
U.S.C. § 2000cc-1(a).  *See also Cutter*, 544 U.S. at 722.

    To support their position, Defendants offer the Declaration
of Ron Bishop, Chief Deputy of Corrections for the MCSO.  Chief
Deputy Bishop is in charge of maintaining the order and control
of each of the detention facilities in Multnomah County in
addition to supervising the corrections deputies who staff these
facilities.  Chief Deputy Bishop has been an employee of MCSO for
24 years.  Defendants also offer the Declaration of Catherine
Moyer, Management Assistant for MCSO.  Moyer's duties include
managing the Chaplains' Unit, which encompasses interviewing,
hiring, and placement of the staff and volunteers who provide
religious services to inmates at MCDC as well as Inverness Jail.
These Declarations establish the following undisputed material
facts pertinent to this issue:

        During 2008 MCSO processed approximately 40,000 inmates
through the County's detention facilities.  All bookings and
releases take place at MCDC, which is the County's maximum
security, short-term incarceration facility for county, state,
and federal prisoners.  MCDC has 596 bunks and operates at
approximately 92 percent of its capacity.  The average term of
incarceration at MCDC is eighteen days.

        On average, Native American inmates represent less than
one percent of the entire jail population.  Approximately eighty

16 - OPINION AND ORDER

percent of the jail population consists of Christians of various
denominations.  The need for certain religious leaders is
essentially based on the demand as expressed in terms of the
inmate population's religious demographic.

MCSO has two permanent full-time chaplains on staff:
Lewis Kyle and Scott Duncan.  Chaplain Lewis Kyle is an African-
American seminary graduate.  Chaplain Scott Duncan worked with
the chaplain's office in the Navy and has performed admini-
strative and ministry activities through his church for many
years.  These MCSO staff chaplains respond to service requests
from inmates related to religious services, religious diet, and
reading materials and to various other requests from inmates
related to spiritual and interpersonal needs.

MCSO has a limited budget for the Chaplain's Office,
and, therefore, has approximately 85 people currently
volunteering their time to provide religious support to the
inmates in MCDC and Inverness Jail.  The two staff chaplains
train and work with these volunteer chaplains, who are expected
to serve a minimum of two hours per week in the facility.  Each
volunteer chaplain enters into a contract with MCSO regarding
confidentiality and professionalism, the volunteer program, and
liability issues.  Volunteer chaplains agree to represent their
faith community and to perform religious activities consisting of
spiritual guidance, religious study, or religious services to

17 - OPINION AND ORDER

inmates regardless of spiritual preference.

Because of the size of the inmate population; the size of the physical plant at MCDC; the constraints of staffing and supervision; and the need to maintain the security of the facilities and to provide for the safety of the jail population, visitors, and staff, there are many facilities, activities, and services that MCSO cannot provide to the inmate population.  For example, MCSO is unable to provide sweat lodges, powwows, and drumming groups.  In addition to the potential impact on the safety and security of the jail facility, provision of these services would be hampered by the fiscal constraints of MCDC's operating budget.

### 1.    Compelling government interest.

The Supreme Court has found "maintain[ing] good order . . . consistent with consideration of costs and limited resources" is a compelling government interest. *Cutter*, 544 U.S. at 722.

To the extent Plaintiff takes issue with Defendants' failure to have a Native American chaplain on staff at the time of Plaintiff's request, MCSO's compelling interest in maintaining order consistent with the allocation of scarce resources dictates that staff chaplain positions are created and filled in accordance with the needs of the entire inmate population expressed in terms of its religious demographic.  As

noted, Native Americans constitute less than one percent of the inmate population.

The policy of certifying chaplains ensures volunteer chaplains do not pose a risk to the inmate population or to the maintenance of order at MCDC.  The certification policy also serves MCDC's interest in resource allocation by ensuring that volunteer chaplains will serve the general inmate population rather than a mere subset of the religious denominations reflected in that population.

To the extent Plaintiff challenges Defendants' failure to provide him with access to a Native American clergyman, MCSO asserts it would have had to marshal considerable resources to satisfy Plaintiff's request in light of the substantial time and effort MCSO ultimately has expended to recruit a volunteer chaplain from the Native American Community willing to be certified by MCSO.

In light of these considerations, Defendants have produced sufficient evidence that the policies and practices applied in responding to Plaintiff's request for access to a Native American religious clergyman served a compelling government interest in maintaining good order consistent with the consideration and allocation of costs and limited resources.  *See Cutter*, 544 U.S. at 722.

## 2.   Least restrictive means.

19 – OPINION AND ORDER

Defendants must also establish the challenged policy or practice is the least restrictive means to achieve their compelling government interest. The Ninth Circuit has held "a prison 'cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice.'" *Shakur*, 514 F.3d at 890 (quoting *Warsoldier*, 418 F.3d at 996).

As noted, Defendants were presented with the following alternatives in responding to Plaintiff's grievances:

(1) to provide Plaintiff with access to a Native American clergyman designated by MCSO,

(2) to permit Plaintiff to choose a personal Native American clergyman to bring to MCDC regardless of (a) the clergyman's proximity on a national scale to Multnomah County or (b) the quality and quantity of contact information Plaintiff was able to provide,

(3) to use PCC and NARA to identify a local Native American clergyman to contact on Plaintiff's behalf and to inquire whether he was available to see Plaintiff at MCDC, or

(4) to recruit a potential volunteer chaplain from the Native American community who was willing to apply and to complete the certification process.

The record shows the efficacy of the alternatives

listed above is outweighed by the efficacy of Defendants' course
of action in light of:

       (1) fiscal constraints,

       (2) time constraints posed by the likely duration
of Plaintiff's incarceration at MCDC in comparison with the
length of time it would take to identify a Native American
clergyman willing to see Plaintiff at MCDC, and

       (3) the risk of wasting allocated resources if
Plaintiff found one or more of the clergymen produced by MCSO did
not meet Plaintiff's requirements.

       Even after drawing all reasonable inferences from
this record in favor of Plaintiff, the Court concludes Defendants
have produced sufficient evidence that less restrictive means
were considered and rejected to achieve their compelling
government interest in "maintain[ing] good order . . . consistent
with consideration of costs and limited resources." *See Cutter*,
544 U.S. at 722.

       In summary, the Court concludes Defendants have
satisfied their burden to overcome any *prima facie* claim under
RLUIPA.  The Court, therefore, grants Defendants' Motion for
Summary Judgment as to Plaintiff's RLUIPA claim.

**II.  Plaintiff's claims as analyzed under the Free Exercise
Clause of the First Amendment.**

     Plaintiff contends MCDC's failure to satisfy his request to
provide him with access to a Native American religious clergyman

21 - OPINION AND ORDER

violated his right to the free exercise of his religion guaranteed under the First Amendment to the United States Constitution.

"Prisoners 'do not forfeit all constitutional protections by reason of their conviction and confinement in prison.'" *Shakur*, 514 F.3d at 883 (quoting *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)). "Inmates retain the protections afforded by the First Amendment, 'including its directive that no law shall prohibit the free exercise of religion.'" *Id.* at 883-84 (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987)). "'Lawful incarceration[, however,] brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" *Id.* (quoting *O'Lone*, 482 U.S. at 348).

**A.   Implication of rights under the Free Exercise Clause of the First Amendment.**

As a preliminary matter, Plaintiff's request to see a Native American religious clergyman must implicate the First Amendment. In *Shakur*, the Ninth Circuit addressed whether an inmate must establish that a central tenet of his faith is violated by a prison regulation in order to raise a viable claim under the First Amendment. After reviewing a number of earlier Ninth Circuit cases and the Supreme Court's decision in *Hernandez v. C.I.R.*, 490 U.S. 680 (1989), the Ninth Circuit rejected the "centrality test" and concluded a plaintiff must merely establish

22 - OPINION AND ORDER

his belief is sincerely held and the desired practice is "rooted in [his] religious belief." *Id*. at 885.   The Ninth Circuit noted the Supreme Court's admonition in *Hernandez* that "'[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'"  *Id*. at 884 (quoting *Hernandez,* 490 U.S. at 699).   The Supreme Court also noted in *Employment Division, Department of Human Resources v. Smith*, that

> [i]t is no more appropriate for judges to
> determine the centrality of religious beliefs
> before applying a compelling interest test in the
> free exercise field, than it would be for them to
> determine the importance of ideas before applying
> the compelling interest test in the free speech
> field.

494 U.S. 872, 886-87 (1990).

In light of these standards, the Court concludes Defendants' inability to provide Plaintiff with access to a Native American religious clergyman implicates Plaintiff's rights under the Free Exercise Clause of the First Amendment.

**B.   Factors to consider under *Turner v. Safley*.**

Even if a prison regulation impinges on an inmate's constitutional rights, "the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).  *See also Ward v. Walsh*, 1 F.3d 873, 876-77 (9th Cir. 1993)(in the wake of *Employment Div.,*

*Dep't of Human Res.*, *Turner* continues to apply to inmate claims
based on alleged violations of the Free Exercise Clause).

The Supreme Court sets out four factors in *Turner* that
must be weighed when determining whether a prison regulation is
reasonably related to legitimate penological interests:

> (1) [w]hether there is a "valid, rational
> connection' between the prison regulation and the
> legitimate governmental interest put forward to
> justify it";
>
> (2) [w]hether there are "alternative means of
> exercising the right that remains open to prison
> inmates";
>
> (3) [w]hether "accommodation of the asserted
> constitutional right" will "impact . . . guards
> and other inmates, and on the allocation of prison
> resources generally"; and
>
> (4) [w]hether there is an "absence of ready
> alternatives" versus the "existence of obvious,
> easy alternatives."

482 U.S. at 89-90 (quoting *Block v. Rutherford*, 468 U.S. 576, 586
(1984)).

RLUIPA "mandates a stricter standard of review for
prison regulations that burden the free exercise of religion than
the reasonableness standard under *Turner*." *Shakur*, 514
F.3d at 888 (citing *Warsoldier v. Woodford*, 418 F.3d at 994).
Relying on *Shakur*, Defendants maintain they are entitled to
summary judgment on Plaintiff's First Amendment claim if the
Court grants their Motion as to Plaintiff's RLUIPA claim.
Although Defendants do not address the *Turner* factors

24 - OPINION AND ORDER

individually, Defendants' argument regarding Plaintiff's RLUIPA
claim are generally applicable.

     **1.   First *Turner* factor.**

     The first *Turner* factor "requires [the Court] to
determine whether there was a legitimate penological interest
that is rationally related to the disputed regulation." *Shakur*,
514 F.3d at 885 (citing *Turner*, 482 U.S. at 89).

     As to Plaintiff's RLUIPA claim, Defendants
established their response to Plaintiff's request to see a Native
American clergyman at MCDC served the compelling government
interest of maintaining order and security within MCDC
considering the allocation of limited resources.  That analysis
also applies to Plaintiff's claim under the First Amendment in
that it shows Defendants had a legitimate penological interest to
the extent they placed limitations on Plaintiff's access to a
Native American clergyman.  Defendants followed policies and
practices that limit inmate access to personal clergy (1) who are
local, (2) who the inmate can identify by name, and (3) who are
available to visit the inmate at MCDC.  As noted, these
limitations serve the legitimate penological interests of
maintaining order within the facility and of allocating limited
resources in a manner that is most beneficial to the entire
inmate population; *e.g.*, by avoiding the cost of staff time to
investigate vague individual requests as well as travel expenses

that would be incurred by bringing nonlocal clergy to MCDC.

Accordingly, the Court concludes the first *Turner* factor weighs in favor of Defendants.

### 2.    Second *Turner* factor.

Under the second *Turner* factor, the Court "consider[s] whether [Plaintiff] has alternative means by which he can practice his religion or is denied all means of religious expression." *Id*. (quotation omitted).

Here other means of religious exercise were available to Plaintiff; *i.e.*, those practices for which Plaintiff testified the presence of a Native American clergyman was not required.  Plaintiff also was able to study and to participate in the practices of other religions as part of his religious exercise to become a Native American holy man.

Accordingly, the Court concludes the second *Turner* factor weighs in favor of Defendants.

### 3.    Third *Turner* factor.

Under the third *Turner* factor, the Court must "consider the impact [the] accommodation . . . will have on guards and other inmates, and on the allocation of prison resources generally." *Shakur*, 514 F.3d 887 (quoting *Ward v. Walsh*, 1 F.3d 873, 878 (9th Cir. 1993)).

Plaintiff contends Defendants violated his First Amendment rights when they failed to satisfy his request to see a

26 - OPINION AND ORDER

Native American chaplain regardless of the paucity of information provided by Plaintiff and the time limits set by Plaintiff.  If MCSO was constitutionally required to satisfy such requests, guards and others to whom the request would be made would have to determine whether the quantity and quality of contact information provided by the inmate was sufficient to trigger a duty on the part of the institution and, if so, to determine the scope of that duty.  Thus, there would be a negative impact on guards and other inmates because of the efforts required to satisfy such individual requests even when the inmate himself is unhelpful. In addition, the resources allocated to serve the spiritual needs of the inmate population in general as well as to achieve other legitimate penological interests would be impacted.

On this record, the Court concludes the third *Turner* factor favors Defendants.

### 4.   **Fourth *Turner* factor**.

The fourth Turner factor requires the Court "to consider whether 'there are ready alternatives to the prison's current policy that would accommodate [the plaintiff] at *de minimis* cost to the prison.'"  *Id*. (quoting *Ward*, 1 F.3d at 879). The "existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns."  *Id*. (quoting *Turner*, 482 U.S. at 90).

There was not an "obvious, easy" alternative to

27 - OPINION AND ORDER

Plaintiff's request that MCSO bring a Native American religious clergyman to see him at MCDC within the time limits specified by Plaintiff.  The record reflects Plaintiff gave Defendants vague information of questionable use for finding a Native American chaplain to visit Plaintiff.  Plaintiff's own post-release efforts to recruit a volunteer from the Native American community to serve the religious needs of the inmates at MCDC were less successful than those of MCSO, and, in fact, MCSO's ultimate successful recruitment of a potential Native American volunteer chaplain imposed more than *de minimus* costs on MCSO.  Even greater costs would have been incurred by MCSO to produce a Native American clergyman to meet the conditions of Plaintiff's request.

On this record, the Court concludes producing a Native American clergyman at MCDC under the conditions requested by Plaintiff would have imposed a significant cost to Defendants. Thus, the fourth *Turner* factor weighs in favor of Defendants.

In summary, the Court concludes all four *Turner* factors weigh in Defendants' favor.  Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's First Amendment claim.

**III. Plaintiff's Claim as analyzed under the Equal Protection Clause of the Fourteenth Amendment.**

Plaintiff alleges Defendants violated his right to equal protection under the Fourteenth Amendment because he was not provided with a Native American chaplain while inmates of other denominations were able to meet with chaplains who were knowledgeable in their religion.

"The Equal Protection Clause requires the State to treat all similarly situated people equally." *Shakur*, 514 F.3d at 891 (citing *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). "[T]he Equal Protection Clause entitles each prisoner to 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.'" *Id*. (quoting *Cruz v. Beto*, 405 U.S. 319, 322 (1972)).

In *Shakur*, the Ninth Circuit explained the focus of an equal-protection inquiry in the context of circumstances similar to those in this case should be on Plaintiff's status. *Id*. Ultimately Plaintiff's equal-protection claim cannot survive summary judgment if the difference between Defendants' treatment of Plaintiff and their treatment of non-Native American inmates in terms of access to religious clergy is reasonably related to legitimate penological interests. *See id*. (quoting *DeHart*, 227 F.3d 47, 61 (3d Cir. 2000)).

Plaintiff sufficiently alleged his equal-protection claim in

29 - OPINION AND ORDER

his Complaint and specifically invoked his right to equal protection in the second of his two grievances. Even though Defendants did not explicitly move against Plaintiff's equal-protection claim, however, the Ninth Circuit has concluded the four-part *Turner* test governs equal-protection claims. *Id*. This Court already has concluded that all four of the *Turner* factors weigh in Defendants' favor.

On this record, therefore, the Court concludes Plaintiff cannot establish Defendants violated Plaintiff's right to equal protection. Accordingly, the Court grants Defendants' Motion as to Plaintiff's equal-protection claim.

## CONCLUSION

For these reasons, the Court **GRANTS** Defendants' Motion (#17) for Summary Judgment and **DISMISSES** this matter **with prejudice**.

IT IS SO ORDERED.

DATED this 7th day of August, 2009.

/s/ Anna J. Brown
_____
ANNA J. BROWN
United States District Judge

30 - OPINION AND ORDER